UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SHAWN BROWN, OZAN CIRAK,<br>LUKE SMITH and THOMAS HANNON,<br>each individually and on behalf of all others<br>similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL NUTRITION COMPANIES, INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE NO. **06-80391**

JUDGE **CIV-RYSKAMP**

MAGISTRATE JUDGE

NOTICE OF REMOVAL **VITUNAC**

NIGHT BOX
FILED

**NOTICE OF REMOVAL**

Defendant General Nutrition Companies, Inc. ("GNC"), by its undersigned attorneys, and

without waiving any affirmative defenses they may have, including but not limited to, failure to

state a claim, lack of personal jurisdiction, statute of limitations bars, failure to join an

indispensable party and/or insufficiency of service of process, hereby notifies the Court of the

removal of this suit from the Circuit Court of the 15th Judicial Circuit in and for Palm Beach

County, Florida (the "State Court") to the United States District Court for the Southern District

of Florida pursuant to 28 U.S.C. §§ 1334, 1452(a) and 1446, and Fed. R. Bankr. P. 9027(a)(2).

In support of this Notice of Removal, GNC states as follows:

1. On or about November 20, 2002, Plaintiffs Shawn Brown, Ozan Cirak, Luke

Smith and Thomas Hannon commenced this action by filing a complaint in the State Court styled

*Shawn Brown, Ozan Cirak, Luke Smith and Thomas Hannon, each individually and on behalf of*

*all others similarly situated v. General Nutrition Companies, Inc.*, Case No. CA-02-14221-AB

(the "State Court Proceeding"). Plaintiffs and Defendant are the only named parties.



2.      On January 18, 2006, MuscleTech Research and Development, Inc. and certain affiliated entities (collectively, "MuscleTech") filed a case under chapter 15 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York, styled *In re MuscleTech Research and Development, Inc., et al.*, Case No. 06-10092-jmp. That case was subsequently removed to the United States District Court for the Southern District of New York, Case No. 06-Civ-538 (JSR), Judge Jed. S. Rakoff presiding (the proceedings described in this paragraph are collectively referred to as the "Bankruptcy Case").

3.      Removal of the State Court Proceeding is proper under 28 U.S.C. § 1452(a), which permits removal of causes of action related to bankruptcy cases. Section 1452(a) states as follows:

> **Removal of claims related to bankruptcy cases**
>
> A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

4.      By virtue of the fact that MuscleTech is contractually obligated to indemnify GNC for certain liabilities arising from the standard product indemnity stated in GNC's purchase order terms and conditions or otherwise under state law, where applicable, the State Court Proceeding is a non-core proceeding that is "related to" the Bankruptcy Case.[1] Accordingly, the Court has original but not exclusive jurisdiction over the State Court Proceeding pursuant to 28 U.S.C. § 1334(b).

---

[1] Proceedings "related to" a case under title 11 are those that could "conceivably have any effect on the estate being administered in bankruptcy." *See, e.g., In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987).

5.      Upon removal of the State Court Proceeding to this Court, and to the extent this proceeding is subsequently referred to a bankruptcy court, GNC consents to the entry of final orders or judgment by the judge presiding in such bankruptcy court.

6.      This action is removable to this court within "90 days after the order for relief in this case under the Code" pursuant to Federal Rule of Bankruptcy Procedure § 9027(a)(2). Pursuant to 11 U.S.C. §§ 1511(a)(2) and 301(b), the order for relief in the Bankruptcy Case was entered on January 18, 2006.

7.      Pursuant to 28 U.S.C. § 1446(a) and Fed. R. Bankr. P. 9027(a), GNC has attached to this notice copies of all process, pleadings, and orders that have been filed in the State Court.

8.      GNC has notified all parties of record and the clerk of the State Court of the removal of the State Court Proceeding. A copy of this Notice of Removal is being served on the plaintiffs and filed with the state court as required by 28 U.S.C. § 1446(d).

9.      GNC reserves the right to amend or supplement this Notice of Removal or to present additional arguments in support of its entitlement to remove the case.


**THIS SPACE LEFT INTENTIONALLY BLANK**

WHEREFORE, for the foregoing reasons, GNC hereby removes this action to the United States District Court for the Southern District of Florida and requests that the suit be placed on this Court's docket for further proceedings.

Respectfully submitted,

By: _____

Joseph J. Ward
FBN: 0144924
Elizabeth L. Bevington
FBN: 503339
Holland & Knight LLP
315 South Calhoun Street Suite 600
Tallahassee, FL 32301
Telephone: (850) 425-5606
Facsimile: (850) 224-8832

James G. Munisteri
Michael P. Cooley
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201
Telephone: 214.999.4824

Attorneys for Defendant
GENERAL NUTRITION COMPANIES, INC.

# CERTIFICATE OF SERVICE

I hereby certify that, on April *18th*, 2006, a true and correct copy of the above and foregoing document was mailed, postage prepaid, to the following counsel of record:

John Goldsmith
Trenam, Kernker, Scharf, Barkin, Frye,
O'Neill & Mullis, P.A.
2700 Bank of America Plaza
101 East Kennedy Boulevard
P.O. Box 1102
Tampa, Florida 33602
E-mail: jdgoldsmith@trenam.com

Paul B. Thanasides
Seth Zalkin
Thanasides, Zalkin & Acero
303 Park Avenue South, Suite 1104
New York, New York 10010
E-mail: thanasides@tzalaw.com
E-mail: zalkin@tzalaw.com

Joseph J. Ward
Counsel to General Nutrition Companies, Inc.

**IN THE CIRCUIT COURT FOR THE FIFTEENTH CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA**

THOMAS HANNON, DIANE HEIN,
and BRUCE SUSEL, each individually
and on behalf of all others similarly situated,

       Plaintiffs,

vs.

AST SPORTS SCIENCE, INC., BASIC
RESEARCH LIMITED LIABILITY COMPANY
d/b/a Klein-Becker USA d/b/a Nutrasport,
BODYONICS, LTD. d/b/a Pinnacle, GENERAL
NUTRITION COMPANIES, INC., GENETIC
EVOLUTIONARY NUTRITION, LLC d/b/a GEN,
MET-RX USA, INC. d/b/a Substrate Solutions,
MUSCLETECH, INC., MUSCLETECH RESEARCH
AND DEVELOPMENT, INC., NATURAL
SUPPLEMENT ASSOCIATION, INC. d/b/a EAS,
NUTRACEUTICS CORPORATION d/b/a
Pharmalogic, TWIN LABORATORIES, INC. d/b/a
Twinlab, VITAL PHARMACEUTICALS, INC. d/b/a
VPX, WEIDER NUTRITION INTERNATIONAL,
INC. d/b/a American Body Building d/b/a Metaform,

       Defendants.

_____/

FDR

Case **CA '02 0 0 9 0 7 1 AB**

**CLASS REPRESENTATION**
JURY TRIAL DEMANDED



## CLASS ACTION COMPLAINT

      Plaintiffs, individually and on behalf of all others similarly situated, and by and

through undersigned counsel, hereby sue Defendants AST Sports Science, Inc., Basic

Research Limited Liability Company d/b/a Klein-Becker USA d/b/a Nutrasport,

Bodyonics, Ltd. d/b/a Pinnacle, General Nutrition Companies, Inc., Genetic Evolutionary

Nutrition, LLC d/b/a GEN, Met-Rx USA, Inc. d/b/a Substrate Solutions, Muscletech,

Inc., Muscletech Research and Development, Inc., Natural Supplement Association, Inc.

d/b/a EAS, Nutraceutics Corporation d/b/a Pharmalogic, Twin Laboratories, Inc. d/b/a



Twinlab, Vital Pharmaceuticals, Inc. d/b/a VPX, Weider Nutrition International, Inc.

d/b/a American Body Building d/b/a Metaform and allege upon personal knowledge with

respect to themselves and their own acts and upon information and belief based, in part,

on the investigation of counsel, as follows:

## INTRODUCTION

1.     This is a consumer class action against sellers of products commonly referred to

within the nutritional supplement industry as Prohormones, the most widely recognized

of which is Androstenedione.

2.     Plaintiffs bring this action to recover damages for and enjoin Defendants'

deceptions, misrepresentations and false, misleading and unconscionable statements and

practices in connection with the marketing and sale of Prohormone Products, as defined

below.

3.     Defendants have falsely marketed and continue to falsely market Prohormone

Products as effective and legal promoters of muscle growth in humans. Defendants often

market their Prohormone Products as legal alternatives to illegal anabolic steroids,

directly comparing the effects of Prohormone Product use to that of illegal anabolic

steroids. The following table represents a few examples of Defendants' false claims:

| Company | False Claims |
|---------|--------------|
| AST | "[e]nhance Testosterone and Nortestosterone Production to Help You Build Lean Muscle Fast!" |
| Basic | -"[u]nlike pills and powders, the new topical gels increase testosterone, muscle growth, strength, and definition without causing feminization." |
| EAS | -EAS claims Andro-6's "oral form of androstenedione is metablolized in the liver to testosterone..." and "will increase blood levels of both androstenedione and testosterone. Secondary to this increase, effects are often seen such as increased energy, enhanced recovery and growth from exercise, heightened sexual arousal and functions, as well as greater sense of well being." |

| GEN | -"Studies have shown that men who take 50mg of Androstenedione have increased their testosterone levels to between 140%-183% above their normal. |
| Met-RX | -In a television advertisement first airing on September 22, 1998, Met-Rx claimed that Androstenedione "can help you add size, strength and cuts without the risk" of steroids.<br>-Met-Rx claims "Andro Stack is for individuals seeking lean mass and strength gains while losing body fat and increasing vascularity." |
| Muscletech | -Muscletech encourages users to "combine Nortesten with Anotesten … to achieve incredible gains in lean muscle mass, size and strength." |
| Pharmalogic | -Pharmalogic claims XRX (AndrogenX) is a "Powerful androgenic for muscular support and performance enhancement with rapid absorption." |
| Pinnacle | -Pinnacle claims that Androstat 100 is a "Bioactive Mass Modulator" and that it will "enhance your body's natural production of testosterone." |
| Twinlab | -Twinlab claims users will "Gain lean mass and strength faster and more efficiently by raising your testosterone levels safely! Try Nor Andro Fuel Stack! A 19-Nor Androstenedione supplement with DHEA designed for awesome gains!" |
| VPX | -VPX claims that "Paradeca works much like the Anabolic Steroids Parabolan and Deca Durabolin! … A synergistically explosive effect on rapid muscle growth and fat loss occurs when all of these powerful anabolic compounds are completely aborbed …." |
| Weider | -Weider claims Androstenedione is a "performance booster" included within its "power and strength formula" and that "scientific studies have found that vigorous weight-lifting may lead to a deficiency of androstenedione in young men, especially when a plateau effect is reached." |

4.     Defendants are unable to substantiate their repeated claims that Prohormone Products promote muscle growth and are proven effective for such purposes. No bona fide scientific study has concluded that Prohormone Products promote muscle growth. Indeed, a well-developed body of scientific evidence demonstrates that Prohormone Products do not promote muscle growth. As an example, the following table summarizes the findings of several authoritative peer-reviewed clinical studies involving Prohormones:

| Researchers | Publication | Prohormones | Findings |
|---|---|---|---|
| Brown, G.A., et al. | *Journal of American Medical Association* (June, 1999) | Androstenedione | Androstenedione does not increase testosterone, strength or promote muscle growth |

3

| Wallace, M.B., et al. | *Medicine and Science in Sports & Exercise* (December, 1999) | Androstenedione DHEA | Androstenedione and DHEA do not increase testosterone, strength or promote muscle growth |
| Broeder, C.E., et al. | *Archives of Internal Medicine* (November, 2000) | Androstenediol Androstenedione | Androstenedione and Androstenediol do not increase strength or promote muscle growth |

5.     Despite the absence of support for their claims and the abundant contradictory evidence, Defendants have used the deceptive practices set forth herein to create a large market for their Prohormone Products. Some estimates describe the market for Prohormone Products as reaching $100 million per year over the past few years. Indeed, one survey conducted by a Harvard psychologist concludes that approximately 1.5 million Americans regularly consume Prohormone Products and that 18% of average male gym-goers and 56% of self-described bodybuilders have used Prohormone Products.

## THE CLASSES

6.     With respect to the Defendants that reside in the state of Florida, including Nutraceutics Corporation d/b/a Pharmalogic and Vital Pharmaceuticals, Inc., Plaintiffs bring this action on behalf of all persons who have, during the applicable limitations period through the present (the "Class Period"), purchased those Defendants' Prohormone Products within the United States.

7.     With respect to the Defendants that reside outside the state of Florida, including AST Sports Science, Inc., Basic Research Limited Liability Company d/b/a Klein-Becker USA d/b/a Nutrasport, Bodyonics, Ltd. d/b/a Pinnacle, General Nutrition Companies, Inc., Genetic Evolutionary Nutrition, LLC d/b/a GEN, Met-Rx USA, Inc. d/b/a Substrate

4

Solutions, Muscletech, Inc., Muscletech Research and Development, Inc., Natural Supplement Association, Inc. d/b/a EAS, Twin Laboratories, Inc. d/b/a Twinlab and Weider Nutrition International, Inc. d/b/a American Body Building d/b/a Metaform, Plaintiffs bring this action on behalf of all persons who have, within the Class Period, purchased those Defendants' Prohormone Products within the state of Florida.

## PARTIES

8.      Defendant AST Sports Science, Inc. ("AST") is a corporation organized and existing under the laws of the state of Colorado with its principal place of business at 120 Capital Drive, Golden, Jefferson County, Colorado.   AST designs, develops, manufactures, markets and sells a variety of purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness.  At all relevant times herein, AST was engaged in substantial and not isolated activities within the state of Florida.  At all relevant times herein, AST also committed tortuous acts within the state of Florida.  AST also, at all relevant times herein, caused injury to persons or property within the state of Florida arising out of an act or omission outside of Florida while engaged in solicitation activities within Florida or while it processed, serviced or manufactured products used or consumed in Florida in the ordinary course of commerce, trade or use.

9.      Defendant Basic Research Limited Liability Company d/b/a Klein-Becker USA and d/b/a Nutrasport ("Basic") is a limited liability corporation organized and existing under the laws of the state of Utah with its principal place of business at 402 West 5050 North, Provo, Utah.  Basic designs, develops, manufactures, markets and sells a variety

5

of purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness. At all relevant times herein, Basic was engaged in substantial and not isolated activities within the state of Florida. At all relevant times herein, Basic committed tortuous acts within the state of Florida. Basic also, at all relevant times herein, caused injury to persons or property within the state of Florida arising out of an act or omission outside of Florida while engaged in solicitation activities within Florida or while it processed, serviced or manufactured products used or consumed in Florida in the ordinary course of commerce, trade or use.

10.     Defendant Bodyonics, Ltd. d/b/a Pinnacle ("Pinnacle") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 140 Lauman Lane, Hicksville, New York. Pinnacle designs, develops, manufactures, markets and sells a variety of purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness. At all relevant times herein, Pinnacle was engaged in substantial and not isolated activities within the state of Florida. At all relevant times herein, Pinnacle committed tortuous acts within the state of Florida. Pinnacle also, at all relevant times herein, caused injury to persons or property within the state of Florida arising out of an act or omission outside of Florida while engaged in solicitation activities within Florida or while it processed, serviced or manufactured products used or consumed in Florida in the ordinary course of commerce, trade or use.

11.     Defendant General Nutrition Companies, Inc. ("GNC") is a corporation organized and existing under the laws of the state of Pennsylvania with its principal place of

business at 300 Sixth Avenue, Pittsburgh, Pennsylvania. GNC is a large retailer of dietary supplements including products containing Prohormones. GNC has over 5,000 locations worldwide including many in Florida and, along with Rexall Sundown, Inc., the parent company of Defendant Met-Rx USA, Inc., is a wholly owned subsidiary of Koninklijke Numico, NV, a Netherlands Company. At all relevant times herein, GNC was engaged in substantial and not isolated activities within the state of Florida. At all relevant times herein, GNC committed tortuous acts within the state of Florida. GNC also, at all relevant times herein, caused injury to persons or property within the state of Florida arising out of an act or omission outside of Florida while engaged in solicitation activities within Florida or while it processed, serviced or manufactured products used or consumed in Florida in the ordinary course of commerce, trade or use. Defendant GNC may sometimes be referred to herein as a Retailer Defendant.

12.     Defendant Genetic Evolutionary Nutrition, LLC is a limited liability corporation organized and existing under the laws of the state of Nevada with its principal place of business at 5341 Russel Ave. #7, Los Angeles, Los Angeles County, California. Genetic Evolutionary Nutrition, LLC, under its own name and the trade name GEN, designs, develops, manufactures, markets and sells a variety of purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness. Genetic Evolutionary Nutrition, LLC will be referred to herein as "GEN." At all relevant times herein, GEN was engaged in substantial and not isolated activities within the state of Florida. At all relevant times herein, GEN committed tortuous acts within the state of Florida. GEN also, at all relevant times herein, caused injury to persons or property

within the state of Florida arising out of an act or omission outside of Florida while engaged in solicitation activities within Florida or while it processed, serviced or manufactured products used or consumed in Florida in the ordinary course of commerce, trade or use.

13.     Defendant Met-Rx USA, Inc. ("Met-Rx") is a corporation organized and existing under the laws of the state of Nevada, with its principal place of business at 6111 Broken Sound Parkway NW, Boca Raton, Palm Beach County, Florida.  Met-Rx is a wholly owned subsidiary of Rexall Sundown, Inc., a corporation organized and existing under the laws of the state of Florida.  Previously a publicly held company, Rexall Sundown, Inc. was acquired in 2000 and is now a wholly owned subsidiary of Koninklijke Numico, NV, a Netherlands Company.  Met-Rx designs, develops, manufactures, markets and sells purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness.  As a result of aggressive marketing and promotional efforts, Met-Rx has emerged as a leader in the growing sports nutrition supplement industry. Met-Rx's current product offerings include protein and meal replacement powders and shakes, fat-loss supplements as well as a variety of other vitamin, mineral and herbal products.  Met-Rx no longer manufactures its Prohormone Products.  During a significant portion of the Class Period, however, Met-Rx was one of the nation's largest sellers of Prohormone Products, which it marketed under its own name and under the trade name Substrate Solutions.

14.     Defendant Muscletech, Inc. is a corporation organized and existing under the laws of the state of Texas with its principal place of business at 2422 Broadway Street,

Lubbock, Lubbock County, Texas. Defendant Muscletech Research and Development, Inc. is a Canada corporation with its principal place of business located at 7045 Tranmere Drive, Missisauga, Ontario, Canada L5S 1M2. Muscletech, Inc. is wholly owned and controlled by and acts as the United States distributor for Muscletech Research and Development, Inc. Muscletech, Inc. and Muscletech Research and Development, Inc. will be referred to herein jointly as "Muscletech." Muscletech designs, develops, manufactures, markets and sells a variety of purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness. At all relevant times herein, Muscletech was engaged in substantial and not isolated activities within the state of Florida. At all relevant times herein, Muscletech committed tortuous acts within the state of Florida. Muscletech also, at all relevant times herein, caused injury to persons or property within the state of Florida arising out of an act or omission outside of Florida while engaged in solicitation activities within Florida or while it processed, serviced or manufactured products used or consumed in Florida in the ordinary course of commerce, trade or use.

15. Defendant Natural Supplement Association Incorporated d/b/a EAS, Inc. ("EAS") is a corporation organized and existing under the laws of the state of Colorado with its principal place of business at 555 Corporate Circle, Golden, Colorado. EAS designs, develops, manufactures, markets and sells a variety of purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness. At all relevant times herein, EAS was engaged in substantial and not isolated activities within

9

the state of Florida. At all relevant times herein, EAS committed tortuous acts within the state of Florida. EAS also, at all relevant times herein, caused injury to persons or property within the state of Florida arising out of an act or omission outside of Florida while engaged in solicitation activities within Florida or while it processed, serviced or manufactured products used or consumed in Florida in the ordinary course of commerce, trade or use.

16. Defendant Nutraceutics Corporation is a corporation organized and existing under the laws of the state of Florida that does business at 3317 NW 10th Terrace # 404, Fort Lauderdale, Broward County, Florida. Nutraceutics Corporation also maintains an office in St. Louis, Missouri. Nutraceutics Corporation designs, develops, markets and sells, under its own name and the trade name Pharmalogic, a variety of purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness. Nutraceutics Corporation develops, markets and sells its Prohormone Products primarily from its Ft. Lauderdale location and under the trade name Pharmalogic, which it refers to as its "sports division". Nutraceutics Corporation will hereinafter be referred to as Pharmalogic.

17. Defendant Twin Laboratories, Inc. d/b/a Twinlab ("Twinlab") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 150 Motor Parkway, Hauppauge, New York. Twinlab designs, develops, manufactures, markets and sells a variety of purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness. At all relevant times

10

herein, Twinlab was engaged in substantial and not isolated activities within the state of Florida. At all relevant times herein, Twinlab committed tortuous acts within the state of Florida. Twinlab also, at all relevant times herein, caused injury to persons or property within the state of Florida arising out of an act or omission outside of Florida while engaged in solicitation activities within Florida or while it processed, serviced or manufactured products used or consumed in Florida in the ordinary course of commerce, trade or use.

18.     Defendant Vital Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the state of Florida with its principal place of business at 1928 Tigertail Blvd., Dania, Broward County, Florida. Vital Pharmaceuticals, Inc. designs, develops, markets and sells, under the trade names VPX and VPX Sports, a variety of purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness. Vital Pharmaceuticals, Inc. will hereinafter be referred to as VPX.

19.     Defendant Weider Nutrition International, Inc. d/b/a American Body Building and d/b/a Metaform ("Weider") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 2002 South 5070 West, Salt Lake City, Utah. Weider designs, develops, manufactures, markets and sells a variety of purported performance enhancing products targeted at a broad customer base with a wide range of sophistication, from seasoned athletes and bodybuilders to the average person interested in fitness. At all relevant times herein, Weider was engaged in substantial and not isolated activities within the state of Florida. At all relevant times herein, Weider committed tortuous acts within the state of Florida. Weider also, at all relevant times

herein, caused injury to persons or property within the state of Florida arising out of an act or omission outside of Florida while engaged in solicitation activities within Florida or while it processed, serviced or manufactured products used or consumed in Florida in the ordinary course of commerce, trade or use.

20. Plaintiff, Diane Hein, is an individual who, at all relevant times herein, maintained her permanent place of residence in Pinellas County, Florida. Plaintiff has been injured by Defendant Met-Rx as the result of her purchase from Defendants AST and Met-Rx during the Class Period of one or more of AST's and Met-Rx's Prohormone Products that were falsely advertised as legal, effective promoters of muscle growth. Plaintiff was exposed to these Defendants' deceptive marketing of their Prohormone Products on the Internet, in various magazines and other periodicals and on their product labeling.

21. Plaintiff, Thomas Hannon, is an individual who at all relevant times herein, maintained his permanent place of residence in Pinellas County, Florida. Plaintiff Thomas Hannon has been injured by Defendants Basic, EAS, GEN, GNC, Met-Rx, Muscletech, Pharmalogic, Pinnacle, Twinlab, VPX and Weider, as the result of his purchase from each of these Defendants during the Class Period of one or more of their Prohormone Products that were falsely advertised as legal, effective promoters of muscle growth. Plaintiff was exposed to these Defendants' deceptive marketing of their Prohormone Products on the Internet, in various magazines and other periodicals and on Defendants' product labeling

22. Plaintiff, Bruce Susel, is an individual who, at all relevant times herein, maintained his permanent place of residence in Pinellas County, Florida. Plaintiff has

been injured by Defendant Basic as the result of his purchase from Defendant Basic during the Class Period of one or more of Basic's Prohormone Products that were falsely advertised as legal, effective promoters of muscle growth. Plaintiff was exposed to Defendant Basic's deceptive marketing of their Prohormone Products on the Internet, in various magazines and other periodicals and on Basic's product labeling.

## PROHORMONES AND PROHORMONE PRODUCTS DEFINED

23.     The term prohormone is commonly used in the supplement industry to describe a hormone that is a precursor to another hormone. For purposes of this Complaint, the term Prohormone includes each of the following related hormonal substances:

| REFERRED TO HEREIN AS | CHEMICAL NAME |
|---|---|
| Androstenedione | 4-androstene-3,17-dione |
| Androstenediol | 4-androstene-3,17-diol |
| Nordione | 19-nor-4-androstene-3,17-dione |
| Nordiol | 19-nor-4-androstene-3,17-diol |
| 5-Adione | 5-androstene-3,17-dione |
| 5-Adiol | 5-androstene-3,17-diol |
| Nor-5-dione | 19-nor-5-androstene-3,17-dione |
| Nor-5-diol | 19-nor-5-androstene-3,17-diol |
| 1-Androstenedione | 1(5alpha)-androstene-3,17-dione |
| 1-Androstenediol | 1(5alpha)-androstene-3,17-diol |
| 1-Testosterone | 17beta-hydroxy, 5alpha-androst-1-ene-3-one |
| 1,4-androstadione | 1,4-androstadiene-3,17-dione |
| 5alpha-Androstanediol | 5alpha-androstane-3,17-diol |

| DHEA | Dehydroepiandrosterone |
|------|------------------------|

24.    For purposes of this Complaint, a Prohormone Product is any product that contains one or more of the Prohormones listed above.

## PROHORMONES, STEROIDS AND MUSCLE GROWTH

25.    Many years ago, scientists discovered that the use of some anabolic steroids, including testosterone, could under certain circumstances enhance muscle growth and athletic performance.

26.    Unfortunately, these substances also produce significant negative side effects and can cause long-term adverse health consequences.  Concern over the abuse potential of testosterone and other anabolic steroids caused the Florida legislature to restrict their sale and classify them as controlled substances in Chapter 893, Florida Statutes.  Most states and the federal government have similar statutes.

27.    Prohormones are the latest in a long line of products developed by the nutritional supplement industry to satisfy the public's demand for effective, legal products that help users gain lean muscle mass and enhance athletic performance.

28.    Prohormone Products are uniquely positioned to capitalize on the public's fascination with illegal anabolic steroid hormones because of their similarity to such substances, in name and structure.  In fact, sellers of Prohormone Products routinely compare Prohormones to illegal anabolic steroids in their advertisements and often purposely choose names for Prohormone Products that resemble the names of illegal anabolic steroids.

29.     Like illegal anabolic steroids, Prohormones belong to the general class of hormonal substances called steroids, which includes both androgenic and estrogenic hormones.

30.     Steroid hormones belonging to the androgenic class are chemically and pharmacologically related to testosterone and are generally associated with male characteristics including facial and body hair growth, deepening of the voice and enlargement of the prostate.

31.     Steroids belonging to the estrogenic class are related to estrogen and are generally associated with female characteristics as well as water retention, gynecomastia and fat deposition.

32.     Each of the Prohormones is an androgenic steroid hormone.

33.     Each of the Prohormones is a steroid hormone that is chemically and pharmacologically related to testosterone.

34.     Androgenic steroid hormones that are related to testosterone and that also promote muscle growth are described as androgenic/anabolic steroids and sometimes simply referred to as anabolic steroids.

35.     Not all anabolic steroids directly promote muscle growth. Some anabolic steroids only promote muscle growth indirectly through conversion to an active anabolic compound. For example, oxymetholone (anadrol), which is specifically listed in Chapter 893, Florida Statutes as an illegal anabolic steroid, is not itself anabolic but is instead converted in the body to the highly androgenic/anabolic compound 17alpha-dihydrotestosterone.

36.     Prohormones are not anabolic steroids, as they do not promote muscle growth.

15

37.     No Prohormone directly promotes muscle growth.

38.     No Prohormone indirectly promotes muscle growth by virtue of an effective
conversion into an active compound.

## PROHORMONE MARKET AND RESEARCH

39.     Androstenedione, one of the earliest marketed Prohormones, was introduced to
the public in late 1996, but only became widely recognized in 1998 with the revelation
that Mark McGwire, the famous baseball player and then home run champion, had used
the compound. Mark McGwire later claimed that he had stopped using Androstenedione
and specifically disavowed any support for the Prohormone. But, it was too late; the
public's appetite for performance enhancing supplements had been stimulated. Sales of
Androstenedione soon skyrocketed, and the modern Prohormone market was born.

40.     Sellers of Prohormone Products, including Defendants, quickly capitalized upon
and attempted to reinforce the publicity with aggressive marketing of Androstenedione
and other Prohormone Products.

41.     While clearly successful, Prohormone sellers' advertising practices have not gone
without criticism, sometimes even supplied by industry insiders. For example, the sports
nutrition industry consultant and scientist Will Brink claims that "[t]o really make money
in this industry is easy; all you have to do is lose your conscience. And a new twist is
when a company manipulates science to sell a product. They're taking advantage of the
laymen's ignorance to make it look as if products are research-proven when, in fact they
aren't." And, Oliver Starr, another industry consultant, complains that "[p]robably the
biggest problem in sports nutrition are the unscrupulous marketers who will say or
promote anything to make a buck. Some of these hucksters will fabricate research,

16

adulterate products or flat-out lie about what a compound can do. Sometimes they lie by implication, giving products names that sound suspiciously like controlled substances, hoping to profit by association."

42. As an example of such advertising practices, many sellers of Prohormone Products, including Defendants, have marketed Androstenedione as a legal alternative to illegal anabolic steroids, proven to be effective at promoting muscle growth.

43. Yet, research does not support these claims. No placebo-controlled clinical studies have proven Androstenedione to be effective at promoting muscle growth in humans.

44. In fact, the only accepted, methodologically sound, peer-reviewed clinical studies conducted on humans show that Androstenedione does not promote muscle growth and is actually more effective at increasing estradiol (an estrogenic steroid hormone) levels than testosterone levels. Prohormone sellers, including Defendants, do not properly disclose these facts to consumers.

45. Despite the contrary evidence, Androstenedione continues to be marketed as an effective muscle-building product. The falsity of this claim is demonstrated by the following declaration of the Chief Scientific Officer of Defendant Pinnacle, one of the country's largest sellers of Prohormone Products (including Androstenedione): "[A]nyone who still feels that 4-androstenedione is useful for testosterone boosting or muscle building in men should quit lifting and consider hawking abdominal rollers and cellulite creams. . . . [I]n young, middle-aged-or older-males, 4-androstenedione is, essentially, worthless for muscle building." (Dr. Tim Ziegenfuss, Bodyonics, Ltd.).

46.     To keep the public's attention on the Prohormone market segment, Prohormone sellers continually formulate, market and sell new steroid hormones that are similar to Androstenedione, but advertised as more effective.

47.     With the subsequent introduction of each of the other Prohormones over the years, including Androstenediol, Nordione and Nordiol, sellers, including Defendants, have consistently advertised the ability of each of the Prohormones to promote muscle growth. The frequent bombardment by sellers of claims that Prohormones promote muscle growth has resulted in consumers associating muscle growth with Prohormones.

48.     Indeed, consumers do not take Prohormone Products for any other reason. Consumers' customary use of Prohormone Products is for purposes of promoting muscle growth.

49.     Defendants are aware that consumers' customary use of Prohormone Products is for purposes of promoting muscle growth.

50.     The claims of muscle growth made by Prohormone Product sellers, including Defendants, are consistently unsupported by peer-reviewed, placebo-controlled, human clinical studies.

51.     There is no methodologically sound, peer-reviewed clinical study that proves a Prohormone effective, in the dosage and manner of administration indicated by any of Defendants' Prohormone Products, for purposes of promoting muscle growth in humans.

52.     Yet, consumers interpret and the law requires express and implied claims concerning dietary supplements to be supported by competent and reliable scientific evidence. Placebo-controlled, human clinical studies are the accepted norm in the field of nutritional supplement scientific research.

18

## MARKETING CLAIMS OF DEFENDANT AST

53.     Defendant AST has marketed and sold in the state of Florida during the Class Period at least the following Prohormone Products: 3-Andro Xtreme, 4-Diol 250, 5-Diol 250, Andro 250, DHEA 100, DHEA 50, 19-Nor 250, 19-Nor 3-Andro, Andro 100 and AndroPlex 700 ("AST's Prohormone Products"). All references to marketing activities or claims of AST herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past back to and including the beginning of the Class Period.

54.     AST makes both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth, are legal and are proven to be effective.

55.     For example, AST claims its Prohormone Products "[e]nhance Testosterone and Nortestosterone Production to Help You Build Lean Muscle Fast!"

56.     AST's advertisements contain no warnings regarding the legality of AST's Prohormone Products and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy or revealing the well-accepted body of scientific evidence contradicting AST's claims.

57.     AST's marketing of its Prohormone Products in advertisements displayed on the Internet, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and false and contains material omissions of facts necessary to make AST's assertions not deceptive, misleading or false.

58.    AST's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

59.    AST's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy, and e) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

60.    None of AST's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## MARKETING CLAIMS OF DEFENDANT BASIC

61.    Defendant Basic has marketed and sold in the state of Florida during the Class Period at least the following Prohormone Products: Klein-Becker USA Testrogel and NutraSport Testroxin ("Basic's Prohormone Products"). All references to marketing activities or claims of Basic herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past back to and including the beginning of the Class Period.

62.    Basic makes both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth, are legal and are proven to be effective.

63.     For example, Basic claims "[u]nlike pills and powders, the new topical gels increase testosterone, muscle growth, strength, and definition without causing feminization."

64.     Basic's advertisements contain no warnings regarding the legality of Basic's Prohormone Products and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy or revealing the well-accepted body of scientific evidence contradicting Basic's claims.

65.     Basic's marketing of its Prohormone Products in advertisements displayed on the Internet, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and false and contains material omissions of facts necessary to make Basic's assertions not deceptive, misleading or false.

66.     Basic's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

67.     Basic's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy, and e) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

68.     None of Basic's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are

substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## MARKETING CLAIMS OF DEFENDANT EAS

69.    Defendant EAS has marketed and sold in the state of Florida during the Class Period at least the following Prohormone Product: Andro-6 ("EAS's Prohormone Products"). All references to marketing activities or claims of EAS herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past back to and including the beginning of the Class Period.

70.    EAS makes both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth, are legal and are proven to be effective.

71.    For example, EAS claims Andro-6's "oral form of androstenedione is metabolized in the liver to testosterone . . ." and "will increase blood levels of both androstenedione and testosterone. Secondary to this increase, effects are often seen such as increased energy, enhanced recovery and growth from exercise, heightened sexual arousal and function, as well as greater sense of well being."

72.    EAS's advertisements contain no warnings regarding the legality of EAS's Prohormone Products and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy or revealing the well-accepted body of scientific evidence contradicting EAS's claims.

73.    EAS's marketing of its Prohormone Products in advertisements displayed on the Internet, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and

false and contains material omissions of facts necessary to make EAS's assertions not deceptive, misleading or false.

74.     EAS's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

75.     EAS's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy, and e) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

76.     None of EAS's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## DISSEMINATION OF FALSE CLAIMS AND OTHER DECEPTIVE AND UNFAIR TRADE PRACTICES OF DEFENDANT GNC

77.     Defendant GNC has marketed, sold and distributed in the state of Florida during the Class Period at least the following brands of Prohormone Products: Klein-Becker USA, Iron-Tek, Muscletech, Pinnacle, Twinlab, and Universal ("GNC's Prohormone Products"). All references to sales activities or dissemination of claims by GNC herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past, back to and including the beginning of the Class Period.

78.     Defendant GNC distributes, sponsors, publishes or causes to be published periodicals containing, among other things, advertisements and marketing claims of manufacturers of Prohormone Products. Defendant GNC knows of the claims and statements made by each of the manufacturers of its Prohormone Products.

79.     Defendant GNC knows the statements and claims, including those representing that GNC's Prohormone Products effectively and legally promote muscle growth, made by the manufacturers of its Prohormone Products in advertisements and on the labels of its Prohormone Products are false, deceptive, misleading and unconscionable in violation of the FDUTPA.

80.     Nonetheless, GNC actively sells and distributes these deceptively advertised Prohormone Products to unwitting consumers in the state of Florida and unfairly receives the pecuniary benefits of such sales.

### MARKETING CLAIMS OF DEFENDANT GEN

81.     Defendant GEN has marketed and sold in the state of Florida during the Class Period at least the following Prohormone Products: ANDRO GEN, GEN 19-Norandrostenedione, GEN Androdiol (4-AD) and GEN Cyclodex 4-A-Diol ("GEN's Prohormone Products"). All references to marketing activities or claims of GEN herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past, back to and including the beginning of the Class Period.

82.     GEN made both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth, are legal and are proven to be effective.

83.     For example, GEN claims that "Studies have shown that men who take 50mg of Androstenedione have increased their testosterone levels to between 140%-183% above their normal range within 30 minutes to 3 hours after ingestion.  ANDRO GEN is thus very effective in . . . promoting a lean, muscular look."

84.     GEN's advertisements contain no warnings regarding the legality of GEN's Prohormone Products and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy or revealing the well-accepted body of scientific evidence contradicting GEN's claims.

85.     GEN's marketing of its Prohormone Products in advertisements displayed on the Internet, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and false and contains material omissions of facts necessary to make GEN's assertions not deceptive, misleading or false.

86.     GEN's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

87. GEN's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy, and e) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

88. None of GEN's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## MARKETING CLAIMS OF DEFENDANT MET-RX

89. Defendant Met-Rx has marketed and sold in the state of Florida during the Class Period at least the following Prohormone Products: Androstenedione, Andro Stack, Androdiol, Andro Heat, Diol Stack, Norandrodiol, Nor Stack ("Met-Rx's Prohormone Products"). All references to marketing activities or claims of Met-Rx herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past, back to and including the beginning of the Class Period.

90. Met-Rx makes both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth, are legal and are proven to be effective.

91. For example, in a television advertisement first airing on September 22, 1998, Met-Rx claimed that Androstenedione "can help you add size, strength and cuts without the risk" of steroids. And, Met-Rx claims "Andro Stack is for individuals seeking lean mass and strength gains while losing body fat and increasing vascularity."

92. Met-Rx's advertisements contain no warnings regarding the legality of Met-Rx's Prohormone Products and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy or revealing the well-accepted body of scientific evidence contradicting Met-Rx's claims.

93. Met-Rx's marketing of its Prohormone Products in advertisements displayed on the Internet, on television, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and false and contains material omissions of facts necessary to make Met-Rx's assertions not deceptive, misleading or false.

94. Met-Rx's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

95. Met-Rx's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy, and e) legal status of its Prohormone Products, are all likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

96. None of Met-Rx's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## MARKETING CLAIMS OF DEFENDANT MUSCLETECH

97. Defendant Muscletech has marketed and sold in the state of Florida during the Class Period at least the following Prohormone Products: Anotesten and Nortesten ("Muscletech's Prohormone Products"). All references to marketing activities or claims of Muscletech herein, regardless of tense employed, shall indicate both activities and

27

claims in the present and activities and claims in the past, back to and including the beginning of the Class Period.

98. Muscletech makes both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth, are legal and are proven to be effective.

99. For example, Muscletech encourages users to "combine Nortesten with Anotesten . . . to achieve incredible gains in lean muscle mass, size and strength."

100. Muscletech's advertisements contain no warnings regarding the legality of Muscletech's Prohormone Products and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy or revealing the well-accepted body of scientific evidence contradicting Muscletech's claims.

101.    Muscletech's marketing of its Prohormone Products in advertisements displayed on the Internet, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and false and contains material omissions of facts necessary to make Muscletech's assertions not deceptive, misleading or false.

102.    Muscletech's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

103.    Muscletech's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy,

28

and e) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

104.    None of Muscletech's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## MARKETING CLAIMS OF DEFENDANT PHARMALOGIC

105.    Defendant Pharmalogic has marketed and sold in the state of Florida and throughout the United States during the Class Period at least the following Prohormone Products: XRX (AndrogenX) and Andron SL ("Pharmalogic's Prohormone Products"). All references to marketing activities or claims of Pharmalogic herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past, back to and including the beginning of the Class Period.

106.    Pharmalogic makes both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth, are legal and are proven to be effective.

107.    For example, Pharmalogic claims XRX (AndrogenX) is a "Powerful androgenic for muscular support and performance enhancement with rapid absorption."

108.    Pharmalogic's advertisements contain no warnings regarding the legality or legal status of Pharmalogic's Prohormone Products as dietary supplements and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy, the inapplicability of the claims to the delivery mechanism employed by XRX

(AndrogenX) or the well-accepted body of scientific evidence contradicting Pharmalogic's claims.

109.    Pharmalogic's marketing of its Prohormone Products in advertisements displayed on the Internet, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and false and contains material omissions of facts necessary to make Pharmalogic's assertions not deceptive, misleading or false.

110.    Pharmalogic's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

111.    Pharmalogic's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy, and e) legal status of its Prohormone Products, are all likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

112.    None of Pharmalogic's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## MARKETING CLAIMS OF DEFENDANT PINNACLE

113.    Defendant Pinnacle has marketed and sold in the state of Florida during the Class Period at least the following Prohormone Products: Androstat 100, Androstat 100

Poppers, Androstat 150 Cyclo Poppers, Androstat 6 Cyclo Poppers ("Pinnacle's Prohormone Products"). All references to marketing activities or claims of Pinnacle herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past back to and including the beginning of the Class Period.

114. Pinnacle makes both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth, are legal and are proven to be effective.

115. For example, Pinnacle claims that Androstat 100 is a "Bioactive Mass Modulator" and that it will "enhance your body's natural production of testosterone."

116. Pinnacle's advertisements contain no warnings regarding the legality of Pinnacle's Prohormone Products and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy or revealing the well-accepted body of scientific evidence contradicting Pinnacle's claims.

117. Pinnacle's marketing of its Prohormone Products in advertisements displayed on the Internet, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and false and contains material omissions of facts necessary to make Pinnacle's assertions not deceptive, misleading or false.

118. Pinnacle's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

119.    Pinnacle's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy, and e) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

120.    None of Pinnacle's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## MARKETING CLAIMS OF DEFENDANT TWINLAB

121.    Defendant Twinlab has marketed and sold in the state of Florida during the Class Period at least the following Prohormone Products: Andro Fuel, DHEA Fuel, Nor Andro Fuel, Nor Andro Ripped Fuel Stack and Nor Andro Fuel Stack ("Twinlab's Prohormone Products"). All references to marketing activities or claims of Twinlab herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past back to and including the beginning of the Class Period.

122.    Twinlab makes both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth and increased libido, are legal and are proven to be effective.

123.    For example, Twinlab claims users will "Gain lean mass and strength faster and more efficiently by raising your testosterone levels safely! Try Nor Andro Fuel Stack! A 19-Nor Androstenedione supplement with DHEA designed for awesome gains!"

124.    Twinlab's advertisements contain no warnings regarding the legality of Twinlab's Prohormone Products and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy or revealing the well-accepted body of scientific evidence contradicting Twinlab's claims.

125.    Twinlab's marketing of its Prohormone Products in advertisements displayed on the Internet, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and false and contains material omissions of facts necessary to make Twinlab's assertions not deceptive, misleading or false.

126.    Twinlab's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

127.    Twinlab's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy, and e) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

128.    None of Twinlab's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## MARKETING CLAIMS OF DEFENDANT VPX

129.    Defendant VPX has marketed and sold in the state of Florida and throughout the United States during the Class Period at least the following Prohormone Products: Paradeca, Decavar, EQ, Xenabol Drostanediol and 1-Test ("VPX's Prohormone Products"). All references to marketing activities or claims of VPX herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past, back to and including the beginning of the Class Period.

130.    VPX makes both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth, are legal and are proven to be effective.

131.    For example, VPX claims that "Paradeca works much like the Anabolic Steroids Parabolan and Deca Durabolin! . . . A synergistically explosive effect on rapid muscle growth and fat loss occurs when all of these powerful anabolic compounds are completely absorbed . . .."

132.    VPX's advertisements contain no warnings regarding the legality of VPX's Prohormone Products and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy or the well-accepted body of scientific evidence contradicting VPX's claims.

133.    VPX's marketing of its Prohormone Products in advertisements displayed on the Internet, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and false and contains material omissions of facts necessary to make VPX's assertions not deceptive, misleading or false.

34

134.  VPX's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

135.  VPX's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy, and e) legal status of its Prohormone Products, are all likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

136.  None of VPX's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## MARKETING CLAIMS OF DEFENDANT WEIDER

137.  Defendant Weider has marketed and sold in the state of Florida during the Class Period at least the following Prohormone Products: Metaform Androstenedione, Weider Signature Performance Androstene and American Body Building Androstene Complete ("Weider's Prohormone Products"). All references to marketing activities or claims of Weider herein, regardless of tense employed, shall indicate both activities and claims in the present and activities and claims in the past back to and including the beginning of the Class Period.

138. Weider makes both express and implied claims that its Prohormone Products and their Prohormone ingredients are effective at promoting muscle growth, are legal and are proven to be effective.

139. For example, Weider claims Androstenedione is a "performance booster" included within its "power and strength formula" and that "scientific studies have found that vigorous weight-lifting may lead to a deficiency of androstenedione in young men, especially when a plateau effect is reached."

140. Weider's advertisements contain no warnings regarding the legality of Weider's Prohormone Products and contain no qualifications of any kind revealing the lack of scientific evidence supporting their efficacy or revealing the well-accepted body of scientific evidence contradicting Weider's claims.

141. Weider's marketing of its Prohormone Products in advertisements displayed on the Internet, in magazines and other periodicals and in marketing claims displayed on its Prohormone Product labels and other point-of-sale materials is deceptive, misleading and false and contains material omissions of facts necessary to make Weider's assertions not deceptive, misleading or false.

142. Weider's express and implied claims regarding a) biological and physiological effect, b) proof of such biological and physiological effect, and c) legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

143. Weider's omissions regarding a) lack of biological and physiological effect, b) lack of proof of biological and physiological effect, c) proof of certain possibly unwanted biological and physiological effects, d) proof of Prohormones' lack of efficacy, and e)

legal status of its Prohormone Products are likely to mislead reasonable consumers acting reasonably under the circumstances to their detriment.

144. None of Weider's express and implied objective claims made in its advertising or on its Prohormone Product labels and other point-of-sale marketing materials are substantiated with scientifically accepted, reliable and competent evidence, including peer-reviewed, placebo-controlled human clinical studies.

## CLASS ACTION ALLEGATIONS

145. Plaintiffs bring a separate class action claim against each of the Defendants pursuant to Rules 1.220(b)(2) and (b)(3) of the Florida Rules of Civil Procedure. The classes will be referred to individually as the AST Class, the Basic Class, the EAS class, the GEN Class, the GNC Class, the Met-Rx Class, the Muscletech Class, the Pharmalogic Class, the Pinnacle Class, the Twinlab Class, the VPX Class and the Weider Class.

146. The class definitions set forth herein are subject to amendment upon completion of discovery.

147. Each class is so numerous as to make joinder impossible.

148. Plaintiffs' claims against each of the Defendants involves questions of law and fact common to that Defendant's respective class, because Plaintiffs and the other members of the particular Defendant's Class were subject to that Defendant's practice of using deception and misrepresentation in connection with the sale of its Prohormone Products and in the marketing of its Prohormone Products on the Internet, magazines and in other media. Plaintiffs and the members of each class are entitled to recover damages and penalties as a result of the particular Defendant's conduct in violation of the Florida Deceptive and Unfair Trade Practices Act, §501.02, et seq., Florida Statutes

("FDUTPA"). Further, Plaintiffs and the members of each class are entitled to have the particular Defendant enjoined from engaging in such deceptive and unconscionable conduct in the future.

149. With respect to the AST Class, Plaintiff Diane Hein seeks certification of a class of all individuals who purchased AST's Prohormone Products within the state of Florida during the Class Period. The FDUTPA is appropriately applied to all of the claims of AST Class members because of the state interests resulting from AST's marketing and sale of its Prohormone Products in Florida.

150. With respect to the Basic Class, Plaintiffs Thomas Hannon and Bruce Susel seek certification of a class of all individuals who purchased Basic's Prohormone Products within the state of Florida during the Class Period. The FDUTPA is appropriately applied to all of the claims of Basic Class members because of the state interests resulting from Basic's marketing and sale of its Prohormone Products in Florida.

151. With respect to the EAS Class, Plaintiff Thomas Hannon seeks certification of a class of all individuals who purchased EAS's Prohormone Products within the state of Florida during the Class Period. The FDUTPA is appropriately applied to all of the claims of EAS Class members because of the state interests resulting from EAS's marketing and sale of its Prohormone Products in Florida.

152. With respect to the GEN Class, Plaintiff Thomas Hannon seeks certification of a class of all individuals who purchased GEN's Prohormone Products within the state of Florida during the Class Period. The FDUTPA is appropriately applied to all of the claims of GEN Class members because of the state interests resulting from GEN's marketing and sale of its Prohormone Products in Florida.

153.   With respect to the GNC Class, Plaintiff Thomas Hannon seeks certification of a class of all individuals who purchased Prohormone Products from GNC within the state of Florida during the Class Period.  The FDUTPA is appropriately applied to all of the claims of GNC Class members because of the state interests resulting from GNC's knowing distribution and sale of falsely advertised Prohormone Products within Florida.

154.   With respect to the Met-Rx Class, Plaintiffs Thomas Hannon and Diane Hein seek certification of a class of all individuals who purchased Met-Rx's Prohormone Products within the state of Florida during the Class Period.  The FDUTPA is appropriately applied to all of the claims of Met-Rx Class members because of the state interests resulting from Met-Rx's marketing and sale of its Prohormone Products in Florida.

155.   With respect to the Muscletech Class, Plaintiff Thomas Hannon seeks certification of a class of all individuals who purchased Muscletech's Prohormone Products within the state of Florida during the Class Period.  The FDUTPA is appropriately applied to all of the claims of Muscletech Class members because of the state interests resulting from Muscletech's marketing and sale of its Prohormone Products in Florida.

156.   With respect to the Pharmalogic Class, Plaintiff Thomas Hannon seeks certification of a class of all individuals who purchased Pharmalogic's Prohormone Products within the United States during the Class Period.  The Pharmalogic Class is appropriately certified as a nationwide class because the FDUTPA is applicable to all members of the Pharmalogic Class including those residing outside of Florida.  The state of Florida has sufficient state interest through a significant contact or aggregation of contacts to the claims asserted by each member of the Pharmalogic Class so that the

choice of Florida law is not arbitrary or unfair. All of Pharmalogic's sales of its Prohormone Products as well its marketing activities have their origin in Florida and Pharmalogic is domiciled in Florida. Alternatively, the FDUTPA is appropriately applied to the claims of members of the Pharmalogic Class residing outside of Florida because, as it relates to those claims, the FDUTPA is not inconsistent with the state's law that is otherwise appropriately applied to the claims. Alternatively, if inconsistent with the FDUTPA and if deemed to be appropriately applied to any portion of the Pharmalogic Class residing outside the state of Florida, application of the laws of other states will not result in individual issues predominating over common questions of law and fact. Manageable subclasses resulting from any variations in the states' deceptive practices laws can be created. As a final alternative, Plaintiff would seek certification of a class consisting only of individuals who purchased Pharmalogic's Prohormone Products in Florida.

157. With respect to the Pinnacle Class, Plaintiff Thomas Hannon seeks certification of a class of all individuals who purchased Pinnacle's Prohormone Products within the state of Florida during the Class Period. The FDUTPA is appropriately applied to all of the claims of Pinnacle Class members because of the state interests resulting from Pinnacle's marketing and sale of its Prohormone Products in Florida.

158. With respect to the Twinlab Class, Plaintiff Thomas Hannon seeks certification of a class of all individuals who purchased Twinlab's Prohormone Products within the state of Florida during the Class Period. The FDUTPA is appropriately applied to all of the claims of Twinlab Class members because of the state interests resulting from Twinlab's marketing and sale of its Prohormone Products in Florida.

159.    With respect to the VPX Class, Plaintiff Thomas Hannon seeks certification of a class of all individuals who purchased VPX's Prohormone Products within the United States during the Class Period. The VPX Class is appropriately certified as a nationwide class because the FDUTPA is applicable to all members of the VPX Class including those residing outside of Florida. The state of Florida has sufficient state interest through a significant contact or aggregation of contacts to the claims asserted by each member of the VPX Class so that the choice of Florida law is not arbitrary or unfair. All of VPX's sales of its Prohormone Products as well its marketing activities have their origin in Florida and VPX is domiciled in Florida. Alternatively, the FDUTPA is appropriately applied to the claims of members of the VPX Class residing outside of Florida because, as it relates to those claims, the FDUTPA is not inconsistent with the state's law that is otherwise appropriately applied to the claims. Alternatively, if inconsistent with the FDUTPA and if deemed to be appropriately applied to any portion of the VPX Class residing outside the state of Florida, application of the laws of other states will not result in individual issues predominating over common questions of law and fact. Manageable subclasses resulting from any variations in the states' deceptive practices laws can be created. As a final alternative, Plaintiff would seek certification of a class consisting only of individuals who purchased VPX's Prohormone Products in Florida.

160.    With respect to the Weider Class, Plaintiff Thomas Hannon seeks certification of a class of all individuals who purchased Weider's Prohormone Products within the state of Florida during the Class Period. The FDUTPA is appropriately applied to all of the claims of Weider Class members because of the state interests resulting from Weider's marketing and sale of its Prohormone Products in Florida.

161.    Common questions of law and fact exist as to all members of each of the classes and predominate over any questions affecting solely individual members of the classes. Among the questions of law and fact common to the claims of the members of each class are:

a.  Whether the respective Defendant's advertising and marketing of its Prohormone Products is and/or was false, deceptive, misleading, or unconscionable in that it misrepresents the efficacy or legality of the Prohormone Products or makes material omissions regarding the efficacy or legality of the Prohormone Products.

b.  Whether the respective Defendant falsely represented that its Prohormone Products are effective to promote muscle growth or have been proven effective to promote muscle growth.

c.  Whether the Defendant's practices as described above violate the FDUTPA and/or another state's deceptive practices laws if such state's laws are deemed applicable to any part of the action against that Defendant.

d.  With respect to the GNC Class, whether the Defendant disseminated claims of manufacturers of Prohormone Products knowing that such claims were false, deceptive, misleading, or unconscionable and thus violated the FDUTPA.

e.  Whether the class members have sustained damages as a result of their purchase of the Defendant's Prohormone Products and, if so, the proper measure thereof.

    f.  Whether Plaintiffs are entitled to injunctive relief prohibiting the challenged practices and enjoining further sales of the Prohormone Products until such practices are rectified.

162.    Plaintiffs' claims are typical of the claims of the members of each class, because Plaintiffs and the members of each class were similarly exposed to the particular Defendant's unlawful marketing of its Prohormone Products and similarly sustained damages by purchasing its Prohormone Products.

163.    Plaintiffs will fairly and adequately protect the interests of each class.

164.    Plaintiffs have retained counsel competent and experienced in class and deceptive practices litigation and have no conflict of interest with other class members in the maintenance of this class action. In addition, Plaintiffs have no relationship with Defendants except as purchasers of Prohormone Products. Plaintiffs will vigorously pursue the claims of each class.

165.    Each class as defined herein is maintainable pursuant to Rule 1.220(b)(1) of the Florida Rules of Civil Procedure in that:

    a.  Inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the party opposing the class, or

    b.  Adjudication with respect to individual members of the class as a practical matter would be dispositive of the interests of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interests.

166. Each class as defined herein is certifiable pursuant to Rule 1.220(b)(2) of the Florida Rules of Civil Procedure. Each Defendant has acted on grounds generally applicable to its respective class, in that it has acted in a uniform matter with respect to all members of that class.

167. A class action is superior to other available methods for the fair and efficient adjudication of these controversies because joinder of all members is impracticable or impossible. Furthermore, because the monetary damages suffered by individual class members may be relatively small in each of the classes, the expenses and burden of individual litigation make it impracticable for the class members to individually seek redress for the wrongs done to them. Plaintiffs believe that class members, to the extent they are aware of their rights against Defendants as alleged herein, would be unable to secure counsel to litigate their claims on an individual basis because of the relatively small nature of individual damages, and that a class action is the only feasible means of recovery for the class members with respect to each of the classes. Individual actions would also present a risk of inconsistent decisions, even though the conduct of Defendants has been uniform with respect to each class member.

168. Plaintiffs envision no difficulty in the management of each class.

169. Adequate notice can be given to class members through direct contact using information maintained in Defendants' records, and from those retailers that sell Defendants' Prohormone Products as well as in the same periodicals used by Defendants' to market their Prohormone Products, most of which are owned by or related to one or more Defendants.

170. Damages may be calculated from the sales information maintained in Defendants' records, and from those retailers that sell Defendants' Prohormone Products, so that the cost of administering a recovery for each class can be minimized.

## COUNT I
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### Against All Defendants

171. Plaintiffs reallege and incorporate as though fully set forth herein the allegations in paragraphs 1 through 170 above.

172. Each Defendant's sale of its Prohormone Products to Plaintiffs and the other members of the respective classes as described herein constitutes the "conduct of any trade or commerce" within the meaning of the FDUTPA, §§ 501.02 et. seq., Florida Statutes.

173. Each of the Defendants' misrepresentations and omissions in connection with their marketing and advertising of their respective Prohormone Products and those products' characteristics, benefits, uses or approval as described herein is material and constitutes false, deceptive, misleading and unconscionable practices in violation of the FDUTPA.

174. GNC's knowing dissemination of the deceptive claims regarding its Prohormone Products as well as its sale of Prohormone Products, despite its actual knowledge that the products are deceptively advertised in violation of the FDUTPA, constitutes false, deceptive, misleading and unconscionable practices in violation of the FDUTPA.

175. As a direct and proximate result of Defendants' violations of law, Plaintiffs and the class members have suffered damages, and are entitled to the following relief:

a. the recovery of all monies paid for the Defendants' respective Prohormone Products together with interest at the statutory rate;

b. injunctive relief prohibiting Defendants from disseminating deceptive and unsubstantiated claims regarding their Prohormone Products; and

c. the recovery of all attorneys' fees, costs and expenses of conducting this action.

## COUNT II
## UNJUST ENRICHMENT
### Against All Defendants

176. Plaintiffs reallege and incorporate as though fully set forth herein the allegations in paragraphs 1 through 170 above.

177. As a result of the deceptive and unfair sales and marketing practices outlined above, Plaintiffs and the other members of the Class purchased Prohormone Products, which had and have a negligible value, if any. The revenues flowing to Defendants from the sale of Prohormone Products inured to the benefit of the Defendants.

178. Defendants have been enriched, at the expense of unwitting consumers by profiting from the unconscionable sales and marketing practices described above.

179. Plaintiffs and the other members of the classes, all of whom purchased Prohormone Products as a result of Defendants unconscionable sales and marketing practices as outlined above, have been damaged as a result of their actions, and Defendants have been unjustly enriched thereby.

180.    Plaintiffs and other members of the classes are entitled to damages as a result of the unjust enrichment of Defendants and their shareholders, including the disgorgement of all profits earned by Defendants as a result of the foregoing.

## EQUITABLE RELIEF

181.    Plaintiffs reallege and incorporate as though fully set forth herein the allegations in paragraphs 1 through 170 above.

182.    Unless Defendant's unlawful practices are enjoined Plaintiffs and the class members will continue to suffer irreparable injury; to this extent, their remedy at law is inadequate, and they are entitled to injunctive and other equitable relief herein requested.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the respective classes, pray for judgment as follows:

    a.    Declaring that this action is properly brought as a class action pursuant to Florida Rule of Civil Procedure 1.220, certifying the classes described herein, and declaring that Plaintiffs are proper representatives of the various classes.

    b.    Declaring Defendants to have engaged in unlawful, unfair, deceptive and unconscionable trade practices and enjoining the further commission of those practices.

    c.    Awarding Plaintiffs and the other members of the classes restitution and refund of all monies paid for Defendants' Prohormone Products, plus interest thereon.

    d.    Awarding Plaintiffs and other members of the classes pre-judgment and post-judgment interest as a result of the wrongs complained of herein.

    e.    Awarding Plaintiffs and the other members of the classes their costs and expenses in this litigation, including reasonable attorneys' fees, expert fees and other expenses.

f.   Requiring Defendants to disgorge all revenues received through the sale of their Prohormone Products.

g.   Enjoining Defendants from continuing to engage in the deceptive and unlawful trade practices described in the Complaint.

h.   Awarding Plaintiffs and the members of the classes such other and further relief as may be just and proper under the circumstances.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs, on behalf of themselves and the members of the classes, hereby demand trial by jury on all issues so triable.

Dated: July 25, 2002

JOHN D. GOLDSMITH
Fla. Bar No. 444278
VINCENT B. LYNCH
Fla. Bar No. 917801
JOHN F. PANZARELLA
Fla. Bar No. 0068306
TRENAM, KEMKER, SCHARF,
  BARKIN, FRYE, O'NEILL & MULLIS,
  Professional Association
P.O. Box 1102
Tampa, FL 33602
(813) 223-7474/(813) 229-6553 (fax)
Attorneys for Plaintiff

-and-

PAUL B. THANASIDES
Fla. Bar No. 103039
THANASIDES, ZALKIN & ACERO
P.O. Box 18795
Tampa, FL 33679
(813) 837-0948
(813) 835-9663 (fax)
Attorneys for Plaintiff



STATE OF FLORIDA • PALM BEACH COUNTY
the foregoing is a true copy of the original
filed in my office on this day's entry,
hand and Official Seal.

THIS _18th_ DAY OF _April_ 20 _06_

SHARON R. BOCK
CLERK & COMPTROLLER

By _____
DEPUTY CLERK

48

**CS-80391**

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

**CIV-RYSKAMP**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**

Shawn Brown, Ozan Cirak, Luke Smith, Thomas Hannon,

**DEFENDANTS**

General Nutrition Companies, Inc.

**MAGISTRATE JUDGE**
**VITUNAC**

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Holland & Knight LLP
315 South Calhoun Street, Ste 600
Tallahassee, FL 32301

9:06-cv 80391 KLR/BSV

Attorneys (If Known)

Holland & Knight LLP
315 South Calhoun Street, Ste. 600
Tallahassee, FL 32301

(d) Check County Where Action Arose: ☐ MIAMI-DADE ☐ MONROE ☐ BROWARD ☑ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party) **Bankruptcy**
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

NOT FILED

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | **PERSONAL PROPERTY** | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | ☐ 370 Other Fraud | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 380 Other Personal Property Damage | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 385 Property Damage Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | **CIVIL RIGHTS** |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 441 Voting | **PRISONER PETITIONS** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 443 Housing/ Accommodations | **Habeas Corpus:** |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 444 Welfare | ☐ 530 General |  |  |
|  | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty |  |  |
|  | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other |  |  |
|  | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights |  |  |
|  |  | ☐ 555 Prison Condition |  |  |

**V. ORIGIN** (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☑ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page):
a) Re-filed Case ☐ YES ☑ NO  b) Related Cases ☐ YES ☑ NO
JUDGE _____ DOCKET NUMBER _____

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
11 U.S.C. § 1511(a)(2) + 301(b)

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD _____

DATE 4/18/06

FOR OFFICE USE ONLY
AMOUNT 350.00   RECEIPT # 536900   IFP _____